# United States Court of Appeals for the Federal Circuit

---

**FEDERAL EDUCATION ASSOCIATION –
STATESIDE REGION, KAREN GRAVISS,**
*Petitioners*

**v.**

**DEPARTMENT OF DEFENSE, DOMESTIC
DEPENDENTS ELEMENTARY AND SECONDARY
SCHOOL,**
*Respondent*

---

2015-3173

---

Petition for review of an arbitrator's decision in No.
14-1024-00182-7 by Steven G. Hoffmeyer.

---

Decided: November 18, 2016

---

DOROTHY LOUISE LEE, Federal Education Association
Stateside Region, Dublin, OH, argued for petitioners.

TARA K. HOGAN, Commercial Litigation Branch, Civil
Division, United States Department of Justice, Washing-
ton, DC, argued for respondent. Also represented by
BENJAMIN C. MIZER, ROBERT E. KIRSCHMAN, JR., CLAUDIA
BURKE.

---

Before DYK, PLAGER, and REYNA, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* DYK.

Dissenting opinion filed by *Circuit Judge* PLAGER.

DYK, *Circuit Judge.*

Ms. Karen Graviss petitions for review of an arbitrator's decision denying the Federal Education Association – Stateside Region's ("FEA") grievance of her removal for "inappropriate physical contact with a student." The arbitrator held that FEA failed to show that Ms. Graviss's due process rights were violated and that the Department of Defense and Domestic Dependent Elementary and Secondary Schools ("DDESS") had proved by a preponderance of the evidence that the removal penalty both promoted the efficiency of the service and was reasonable. We hold that Ms. Graviss's due process rights were violated by an improper *ex parte* communication between a supervisor and the deciding official. Accordingly, we reverse and remand.

### BACKGROUND

Ms. Graviss has worked in the education field since 1978, primarily serving as a teacher to young special needs children. Ms. Graviss started as a pre-school teacher for a rehabilitation center and eventually transitioned to work as a second-grade teaching assistant and regular education teacher. From 1994 to 2008, Ms. Graviss worked in the Fort Knox Educational Development Intervention Services Program at Ireland Army Hospital. In 2008, DDESS hired Ms. Graviss as a pre-school teacher for special needs children at Kingsolver Elementary, part of Fort Knox Schools, where she worked until her removal on June 16, 2010. At Kingsolver Elementary, Ms. Graviss taught three- and four-year-old children with disabilities such as autism.

The events precipitating Ms. Graviss's removal are recounted in detail in the arbitrator's decision. *See* J.A. 804–90. For purposes of this appeal, we provide only a brief summary. Special education teachers must make difficult judgment calls in determining how to handle the behavior of their special needs students. This case has its genesis in divergent approaches to that problem.

On January 22, 2010, Dr. Andrea McClain, Kingsolver Elementary's principal and Ms. Graviss's direct supervisor, issued Ms. Graviss a letter of reprimand based on an "inappropriate interaction with a student" and "failure to follow directives." J.A. 691. Specifically, the letter stated that, on January 15, 2010, Ms. Graviss and her aide had physically carried—"under his arms" and "under his knees"—a misbehaving general education pre-school student who "wouldn't come to [the principal's] office" on his own. *Id.* The letter also stated that Ms. Graviss had emailed concerns to Dennis Labriola, the director of special education, when Dr. McClain had previously directed Ms. Graviss to "bring all issues directly to [her] attention as the building principal." *Id.* FEA filed a grievance concerning the letter.

Thereafter, on March 22, 2010, one of Ms. Graviss's students had an episode, which manifested in his repeatedly flailing his arms, kicking, and screaming. While the other students were out at recess, Ms. Graviss employed two methods of physical restraint on the child in an attempt to subdue him. First, Ms. Graviss sat the child in a bean bag chair next to a wall and rolled the chair over itself toward the wall with the student inside. Second, after another outburst approximately three hours later, Ms. Graviss sat the child in a chair, pressed into the back of the chair with her knee, and pulled on the child's crossed arms from behind. Ms. Graviss does not appear to materially dispute the factual record of the events described, but contends that such methods of restraint were not improper. Two of Ms. Graviss's classroom aides who

were present at the time later reported the incidents via email to Dr. McClain. Dr. McClain then conducted an interview with Ms. Graviss in the presence of an FEA representative. After the interview, Dr. McClain completed and submitted a Family Advocacy Program Department of Defense Education Activity ("DoDEA") Serious Incident Report and Alleged Child Abuse Report to the Family Advocacy Program, which operates like Child Protective Services for the military and investigates institutional child abuse.

On March 26, 2010, Dr. McClain forwarded the Serious Incident Report via email to her direct supervisor, Community Superintendent John Todd Curkendall, who would later serve as the deciding official in Ms. Graviss's removal proceedings, and his supervisor, District Superintendent Dr. Frank Calvano. In response to this email, District Superintendent Dr. Calvano replied to both Dr. McClain and Mr. Curkendall ("the March 26 email"), stating, "I think this is going to come back with a ruling of no fowl [sic].[1] *Regardless, we need to try and terminate her for repeated use of corporeal* [sic] *punishment and for insubordination . . . .*" J.A. 630 (emphasis added). Dr. McClain quickly replied to both Dr. Calvano and Mr. Curkendall, stating, "Luckily, we have the two witnesses. I strongly support termination. This would match the DoDEA 1435.1 reg for a second offense of insubordination

---

[1]    By "no fo[u]l," it appears that Dr. Calvano was referencing the Family Advocacy Program investigation, which was separate from Ms. Graviss's removal proceedings and followed from Dr. McClain's mandatory submission of Serious Incident and Child Abuse reports. *See* J.A. 366.

and the one on causing bodily harm.  The second offenses on those both say suspension or removal." *Id.*

On April 12, 2010, Dr. McClain issued a notice of proposed removal for Ms. Graviss.  J.A. 708–09.  The notice alleged a single charge of "inappropriate physical contact with a student" based on the instances of physical restraint discussed above.  The notice did not charge Ms. Graviss with either of the more serious charges of corporal punishment or insubordination discussed by Dr. Calvano in the March 26 email.  *Id.*  The notice informed Ms. Graviss that she could reply both in writing and orally to Mr. Curkendall, who would serve as the deciding official.  J.A. 709.  Ms. Graviss, represented by FEA as her union representative, responded both in writing and orally to Mr. Curkendall.  Neither Ms. Graviss nor FEA was informed at the time about the March 26 email correspondence between Dr. McClain, Dr. Calvano, and Mr. Curkendall.

On June 14, 2010, after considering Ms. Graviss's submitted replies, Mr. Curkendall issued a formal written decision concluding that "the proposed removal and the charge of inappropriate physical contact with a student are fully supported by a preponderance of the evidence. . . . [The removal] is reasonable and promotes the efficiency of the service."  J.A. 797.  Ms. Graviss was removed from her position effective June 16, 2010.

FEA filed a grievance challenging Ms. Graviss's removal on September 9, 2010.  DDESS denied the grievance, and FEA invoked arbitration.  During discovery proceedings leading up to the arbitration, Ms. Graviss learned for the first time about the March 26 email when DDESS produced a copy in discovery.  The arbitrator then held a hearing on October 22 and 23, 2014, at which he heard testimony from many witnesses, including Mr. Curkendall and Dr. Calvano.  Mr. Curkendall testified that, although he considered "everything relative to this

case" in making his decision, his direct supervisor Dr. Calvano "did not direct him how to rule in this matter" in the March 26 email. J.A. 826. Mr. Curkendall further testified that he had issued recent disciplinary decisions contrary to Dr. Calvano's views—including, in this case, imposing lesser punishment than Dr. Calvano had suggested. *See* J.A. 861.

Dr. Calvano similarly testified that he "never issued a directive or an order on how Mr. Curkendall should rule on a case," including with respect to Ms. Graviss. J.A. 827. Dr. Calvano further testified that "I'm responsible for everything and sometimes I make direct decisions and give direct orders and sometimes I opine on matters with respect to sharing my views with proposing officials or deciding officials . . . . Sometimes folks agree with me and sometimes they don't." J.A. 861. Dr. Calvano explained that typically, when he does "opine on proposed discipline," he communicates his opinion to Nancy Gilley, the labor relations specialist. J.A. 827–28. He testified that "I typically, if you will, am overridden by Nancy Gilley . . . . She and I oftentimes agree; sometimes we don't." J.A. 828. On cross-examination, it became apparent that Nancy Gilley, unlike Mr. Curkendall, does not report to Dr. Calvano. *See* J.A. 861–62.

In his final written decision, the arbitrator rejected Ms. Graviss's first due process argument that the March 26 email should have been disclosed to her at an earlier stage of the proceedings. The arbitrator held that the argument "lacks logic" because even if the March 26 email had been disclosed at an earlier stage, the disclosure would not have eliminated the alleged bias. J.A. 863. The arbitrator also rejected Ms. Graviss's due process argument that the March 26 email constituted an improper *ex parte* communication under *Stone v. Federal Deposit Insurance Corp.*, 179 F.3d 1368 (Fed. Cir. 1999). The arbitrator explained, "[i]f Calvano's email was intended to be influential on the proposing or deciding

official it was wholly ineffective. Were those officials influenced by the email they would have had ample opportunity and ability to modify the charges, to rewrite the unwritten, as yet, Notice of Proposed Removal, which they did not do." J.A. 863. The arbitrator then held, without any detailed analysis of the three *Stone* factors discussed below, that "unlike in *Stone*, the Calvano statement contains no 'new and material information.'" *Id.* The arbitrator found that the evidence "do[es] not show Curkendall was not the decider in this matter. The full record shows Curkendall was the independent decider required under case law." J.A. 864.[2]

Ms. Graviss petitions for review in our court. We have jurisdiction under 28 U.S.C. § 1295(a)(9); s*ee also* 5 U.S.C. §§ 7121(b)(2)(B), 7703(b)(1). In reviewing the arbitration award, we apply the same standard that is applied to appeals from the Merit Systems Protection Board ("Board"). 5 U.S.C. § 7121(f); *Young v. Dep't of Hous. & Urban Dev.*, 706 F.3d 1372, 1375 (Fed. Cir. 2013). Under that standard, we must affirm the arbitrator's decision unless it is (1) arbitrary, capricious, an

---

[2] The arbitrator also concluded that "[e]ven if, arguably, [the March 26 email] was 'material relied on in proposing removal' the alleged failure to immediately provide to [Ms. Graviss] was harmless error as [Ms. Graviss] had the information at the hearing, and opportunity to challenge and address it and did so." J.A. 889. As the government concedes, the arbitrator's invocation of a harmless error test here was erroneous. As discussed below, in *Stone* we held that "when a procedural due process violation has occurred because of *ex parte* communications, such a violation is not subject to the harmless error test." 179 F.3d at 1377.

abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence. 5 U.S.C. § 7703(c); *Young*, 706 F.3d at 1375–76. "In addition, we must reverse an arbitrator's decision if it is not in accordance with the requirements of the Due Process Clause of the Fifth Amendment or any other constitutional provision." *Young*, 706 F.3d at 1376 (citing *Ward v. U.S. Postal Serv.*, 634 F.3d 1274, 1278 (Fed. Cir. 2011)).

DISCUSSION

Public employees like Ms. Graviss possess a constitutionally protected property right in their continued employment. *See, e.g.*, *Arnett v. Kennedy*, 416 U.S. 134, 155 (1974); *Stone*, 179 F.3d at 1374. In *Cleveland Board of Education v. Loudermill*, the Supreme Court held that pre-deprivation due process is required in public employee discharge cases, stating,

> [w]e have described the root requirement of the Due Process Clause as being that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest. This principle requires some kind of a hearing prior to the discharge of an employee.

470 U.S. 532, 542 (1985) (internal quotation marks, footnote, and citations omitted). "[W]here a serious procedural curtailment mars an adverse personnel action which deprives the employee of pay, . . . the defect divests the removal . . . of legality . . . . In that situation, the merits of the adverse action are wholly disregarded." *Sullivan v. Dep't of Navy*, 720 F.2d 1266, 1274 (Fed. Cir. 1983) (quoting *Ryder v. United States*, 585 F.2d 482, 487–88 (Ct. Cl. 1978)).

Our decision in *Stone v. Federal Deposit Insurance Corp.* sets forth the constitutional due process require-

ments that apply to cases such as this involving *ex parte* communications to the deciding official. 179 F.3d at 1376. In fact, *Stone* involved nearly identical circumstances to those of this case, as the government largely concedes. Mr. Stone was removed from his federal position, and he appealed to the Board. *Id.* at 1372. During the discovery process, Mr. Stone learned for the first time that the deciding official had received an *ex parte* memorandum from the proposing official and another *ex parte* memorandum from a third government employee, both urging that Mr. Stone be removed. *Id.* at 1372–73. In an affidavit, the deciding official stated that he would have concluded that Mr. Stone should be removed "whether or not he had seen" the *ex parte* memorandum from the proposing official. *Id.* at 1373. The Board denied Mr. Stone's appeal, and he petitioned for review in our court. *Id.*

We held that "[t]he introduction of new and material information by means of *ex parte* communications to the deciding official undermines the public employee's constitutional due process guarantee of notice (both of the charges and of the employer's evidence) and the opportunity to respond." *Id.* at 1376. Accordingly, it is "constitutionally impermissible to allow a deciding official to receive additional material information that may undermine the objectivity required to protect the fairness of the process." *Id.* We went on to explain, however, that "not every *ex parte* communication is a procedural defect so substantial and so likely to cause prejudice that it undermines the due process guarantee and entitles the claimant to an entirely new administrative proceeding." *Id.* at 1376–77. Rather, only *ex parte* communications that "introduce new and material information to the deciding official" contravene due process. *Id.* at 1377. The key, therefore, is determining whether the *ex parte* communication contained "new and material information."

We articulated three relevant factors: whether (1) "the *ex parte* communication merely introduces 'cumulative' information or new information"; (2) "the employee knew of the error and had a chance to respond to it"; and (3) the communications were "of the type likely to result in undue pressure upon the deciding official to rule in a particular manner." *Id.* Ultimately, the inquiry is "whether the *ex parte* communication is so substantial and so likely to cause prejudice that no employee can fairly be required to be subjected to a deprivation of property under such circumstances." *Id.* Finally, we made clear that, if new and material information has been conveyed by the *ex parte* communication, "then a due process violation has occurred and the former employee is entitled to a new constitutionally correct removal procedure . . . . [W]hen a procedural due process violation has occurred because of *ex parte* communications, such a violation is not subject to the harmless error test." *Id.* at 1377. Accordingly, we reversed and remanded for the Board to consider the above factors and make a determination as to whether the *ex parte* communications introduced new and material information such that Mr. Stone's due process rights had been violated. *Id.* Similarly, in *Sullivan* we held that "improper *ex parte* communications were not only unfair, but also denied petitioner his rights under the due process clause of the Constitution" and "further that they tainted the investigation, voided the entire proceeding, and rendered [the] removal decision a nullity." 720 F.2d at 1274.

Before the arbitrator here, Ms. Graviss argued that *Stone* required a finding that her due process rights had been violated. *See* J.A. 946. The arbitrator did not undertake any detailed analysis of the *Stone* factors, but instead summarily concluded that "unlike in *Stone*, the Calvano statement contains no 'new and material information.'" J.A. 863. Substantial evidence, therefore, does not support the arbitrator's decision in this respect. Even

a brief examination of the *Stone* factors reveals that Ms. Graviss's due process rights were violated by the March 26 email.

The government first argues that the *Stone* factors do not apply at all here because the communication occurred before removal proceedings had been brought against Ms. Graviss. The government contends that improper *ex parte* communications can only occur once the removal proceeding had actually begun—in this case, when the notice of proposed removal had been issued. To be sure, as we discuss below, not all *ex parte* communications before the initiation of a proceeding will violate due process. But we see no basis for a distinction between pre- and post-initiation communications when the *ex parte* communication occurred at a time, as is the case here, when an adjudicatory proceeding was contemplated. The risk of creating undue pressure in such circumstances is just as great when *ex parte* contact occurs before the proceeding begins as when it occurs after the proceeding begins.

Here, it is clear that a proceeding was contemplated; indeed, that was the very purpose of the email, and it does not matter for the purposes of constitutional due process whether the *ex parte* communication occurred before or after formal proceedings had been initiated. Notably, under the Administrative Procedure Act, *ex parte* communications in the formal adjudication context are prohibited when "the person responsible for the communication has knowledge [the proceeding] will be noticed." 5 U.S.C. § 557(d)(1)(E).[3] The Board itself follows this rule.

---

[3]   *Id.* § 557(d)(1)(A), (E) (prohibiting "an ex parte communication relevant to the merits of the proceeding" and providing that "the prohibitions of this subsection shall apply beginning at such time as the agency may

*See* 5 C.F.R. § 1201.102 (prohibiting *ex parte* communications "from the time the persons involved know that the Board may consider the matter until the time the Board has issued a final decision"). Accordingly, we proceed to consider the *Stone* factors.

The first *Stone* factor is whether the *ex parte* communication "introduces 'cumulative' information or new information." *Stone*, 179 F.3d at 1377. While the government echoes the arbitrator's conclusion that "the email . . . was not 'new and material evidence,'" it does not argue that the March 26 email was merely "'cumulative' information" under the first factor. Br. of Appellee at 24. Nor could it. The March 26 email clearly introduced new information to Mr. Curkendall, the deciding official, because it informed him for the first time that his supervisor, Dr. Calvano, wanted Ms. Graviss to be removed for "insubordination" and "repeated use of corpor[a]l punishment." J.A. 630. That information, along with Dr. McClain's ready agreement, was not "cumulative" of any other information received by Mr. Curkendall. The first *Stone* factor was satisfied.

As to the second factor, whether "the employee knew of the error and had a chance to respond to it," *Stone*, 179 F.3d at 1377, the government does not dispute that Ms. Graviss only learned about the March 26 email during discovery leading up to arbitration, long after her opportunity to respond to the proposed termination had closed,

---

designate, but in no case shall they begin to apply later than the time at which a proceeding is noticed for hearing unless the person responsible for the communication has knowledge that it will be noticed, in which case the prohibitions shall apply beginning at the time of his acquisition of such knowledge").

the termination decision was made, and she was removed from her position. Accordingly, the second *Stone* factor was satisfied.

The dissent concedes that "[u]ndoubtedly, it would have been preferable had the issue been fully aired at the initial stages of the administrative review, for whatever relevance to the merits it may have had." Dissent at 8. But the dissent suggests that any unfairness resulting from Ms. Graviss's lack of knowledge of the March 26 email prior to her termination was mitigated later when she was given the opportunity to address the email during arbitration. *See id.* That opportunity to address the email occurred four years after her termination when the email was finally disclosed.

It is true that, as the Supreme Court recognized in *Loudermill*, there are "*some* situations in which a post-deprivation hearing will satisfy due process requirements." 470 U.S. at 542 n.7 (emphasis added). But this does not mean that an employee enjoys no due process before removal. Our recognition of the importance of pre-termination due process dates back at least to our holding in *Stone. See* 179 F.3d at 1376 ("An employee is entitled to a certain amount of due process rights at each stage and, when these rights are undermined, the employee is entitled to relief regardless of the stage of the proceedings."); *see also Ward*, 634 F.3d at 1282 ("If the Board finds that the communications did introduce new and material information in violation of [Petitioner's] due process rights, [Petitioner] must be afforded a constitutionally correct removal procedure." (internal quotation marks omitted)). Recently, this court has squarely rejected the idea that an adequate post-termination review can cure a procedurally deficient termination proceeding. *See Young*, 706 F.3d at 1377 ("[Petitioner] was entitled to procedural fairness at each stage of the removal proceedings, not just upon review of the termination decision." (internal quotation marks omitted)).

As to the third factor, whether the communications were "of the type likely to result in undue pressure upon the deciding official to rule in a particular manner," *id.*, Ms. Graviss argues that the March 26 email from a supervisor to a subordinate deciding official is a paradigmatic example of "the type" of communication "likely to result in undue pressure." The government disagrees on this point, contending that "Dr. Calvano's informal opinions are just that: informal opinions. They do not direct, officially recommend, or even pressure an outcome." Br. of Appellees at 29–30. The government emphasizes the arbitrator's finding that the decision-maker here was subjectively independent, arguing that such subjective independence forecloses any due process violation.

It is true, as the government contends, that the arbitrator concluded that the "full record shows Curkendall was the independent decider required under case law," J.A. 864, based on the testimony from Mr. Curkendall and Dr. Calvano that no undue influence had been intended or perceived. And it is true that no such finding had been made in *Stone*, where we remanded to the MSPB for a consideration of the three factors in the first instance. *Stone*, 179 F.3d at 1377. But whether or not the decision-maker was subjectively independent is not the question. Rather, the fundamental issue is whether there was a substantial potential for undue pressure using the objective standard of *Stone*.

The third *Stone* factor, whether the communications were "*of the type likely to* result in undue pressure upon the deciding official to rule in a particular manner," *Stone*, 179 F.3d at 1377 (emphasis added), specifically directs the inquiry to the "type" of communication involved, and does not require proof that the *ex parte* communication actually resulted in undue pressure upon the deciding official to rule in a particular manner. Indeed, we held in *Stone* that "[u]ltimately, the inquiry . . . is whether the *ex parte* communication is so substantial and *so likely to cause*

*prejudice* that no employee can fairly be required to be subjected to a deprivation of property under such circumstances." *Id.* (emphasis added). While proof of subjective undue influence from an undisclosed communication may support a conclusion that there has been a due process violation, the absence of subjective influence does not foreclose the possibility of a violation. *See Ward*, 634 F.3d at 1280 n.2. Accordingly, the arbitrator's finding that Mr. Curkendall in fact believed that he was not unduly influenced by the March 26 email does not preclude a due process violation. We conclude that a petitioner need not prove actual subjective influence in order to demonstrate a violation of due process under *Stone*. *See also Camero v. United States*, 375 F.2d 777, 780 (Ct. Cl. 1967) (invalidating removal despite concluding that the deciding official "made up his own mind when he decided to sustain plaintiff's removal" because "decisions were made, at least in part, on the basis of the *ex parte* communication").

Here, the March 26 email was certainly the "*type*" of communication "likely to result in undue pressure on the deciding official to rule in a particular manner" under the objective framework of the third *Stone* factor. *Stone*, 179 F.3d at 1377 (emphasis added). A supervisor issued what can only most generously be deemed a "suggestion" to a subordinate decision-maker. The nature of this communication, particularly in light of the strong language used, "*we need to try and terminate her . . . ,*" and the specificity of the suggested rationale, "*for repeated use of corporeal* [sic] *punishment and for insubordination,*" J.A. 630 (emphasis added), creates a high risk that a subordinate decision-maker would have been unduly pressured to terminate the employee. Because the undisclosed March 26 email was of the type likely to result in undue pressure, the third *Stone* factor was satisfied.

To be clear, we are not suggesting that the standards of impartiality applicable to the judiciary and to Board adjudication also apply in the context of an agency deci-

sion to remove an employee or other adverse action.[4] Inevitably, due to the nature of the workplace, a deciding official in the employment context likely is familiar with the employee and has knowledge of the employee's prior performance and conduct. Contrary to the dissent's suggestion, we recognize that the existence of such knowledge by officials involved with the removal process (including the deciding official) creates no due process issue, as we held in *Norris v. SEC*, 675 F.3d 1349 (Fed. Cir. 2012). In *Norris*, we affirmed an arbitrator's finding that an alleged *ex parte* communication was not new and material where the alleged *ex parte* communication was merely the deciding official's awareness of a prior incident of the employee's misconduct at the time of her removal decision. *See id.* at 1353–54. As we explained, "a deciding official's mere knowledge of prior misconduct by the employee obtained before the commencement of disciplinary proceedings does not constitute an improper *ex parte* communication." *Id.*

But unlike *Norris*, this case does not involve routine communications and knowledge acquired about an employee's job performance before a decision to commence removal proceedings. Rather, the communication in this case was directed to the conduct of the removal proceedings and is indistinguishable from the type of communication that this court recognized violated due process in

---

[4] Other circuits have rejected such arguments where an impartial decision maker presides over post-termination proceedings. *See, e.g.*, *McDaniels v. Flick*, 59 F.3d 446, 459–60 (3d Cir. 1995) (collecting cases); *Walker v. City of Berkeley*, 951 F.2d 182, 184 (9th Cir. 1991); *Duchesne v. Williams*, 849 F.2d 1004, 1005, 1008 (6th Cir. 1988) (en banc).

*Stone*. All three of the *Stone* factors are satisfied. First, the communication was made in contemplation of removal proceedings and provided the new information that the official's supervisor wanted Ms. Graviss to be terminated. Second, Ms. Graviss was unaware of this communication and, therefore, she had no opportunity to respond to it. Third, the recommendation of termination by the deciding official's supervisor was "of the type likely to result in undue pressure upon the deciding official to rule in a particular manner," in this case, to terminate Ms. Graviss. *Stone*, 179 F.3d at 1377.

We conclude that Ms. Graviss's due process rights were violated, and that substantial evidence does not support the arbitrator's conclusion to the contrary. We need not consider Ms. Graviss's other arguments regarding the merits of her removal. We reverse and remand for further proceedings consistent with this opinion.

## REVERSED AND REMANDED

### COSTS

Costs to petitioners.

# United States Court of Appeals for the Federal Circuit

_____

**FEDERAL EDUCATION ASSOCIATION –
STATESIDE REGION, KAREN GRAVISS,**
*Petitioners*

**v.**

**DEPARTMENT OF DEFENSE, DOMESTIC
DEPENDENTS ELEMENTARY AND SECONDARY
SCHOOL,**
*Respondent*

_____

2015-3173

_____

Petition for review of an arbitrator's decision in No. 14-1024-00182-7 by Steven G. Hoffmeyer.

_____

PLAGER, *Circuit Judge*, dissenting.

I respectfully dissent from the majority's conclusion that, as a matter of law, Ms. Graviss was denied her constitutional rights during her removal from federal service. Not only does the majority reach the wrong conclusion with regard to her due process rights, but the opinion has the potential to chill important discussions regarding personnel matters among responsible supervisors, discussions that are essential to well-functioning agency administration.

The relevant facts are clear. Ms. Graviss was employed as a preschool teacher for special-needs children in

a school operated under the Department of Defense.  Her immediate supervisor was Dr. Andrea McClain, principal of the school.  The school and its principal were under the immediate supervision of John Curkendall, Community Superintendent.  In turn, Mr. Curkendall reported to Dr. Frank Calvano, District Superintendent.  That was the agency chain of command at the time of the events that led to Ms. Graviss' removal.

From the viewpoint of the agency, Ms. Graviss had not performed well.  She had been disciplined previously in a formal letter of reprimand from Dr. McClain for "inappropriate interaction with a student" and "failure to follow directives."  J.A. 691.  That interaction apparently involved physical restraint of a misbehaving student in a manner contrary to the school's standing instructions.

The particular event that precipitated Ms. Graviss' removal involved her again having physically handled a child.  The event was witnessed by two classroom aides who were sufficiently concerned that they reported the event to Principal McClain.  After an investigation, Dr. McClain forwarded a Serious Incident Report to Mr. Curkendall, her immediate supervisor, and Dr. Calvano, at the next supervisory level.  Dr. Calvano obviously was aware of the problem with the teacher's physical handling of children, as he responded to that report with an email, to both Mr. Curkendall and Dr. McClain.  In that email, the District Superintendent said that "we need to try and terminate her for repeated use of corporeal punishment and for insubordination."  J.A. 630.  That email is the subject of this appeal.

The following month, Dr. McClain issued a notice of proposed removal based on "inappropriate physical contact with a student," the event arising from that particular incident.  J.A. 708.  The notice did not include either of the concerns that Dr. Calvano identified, corporal punishment or insubordination.

The Community Superintendent, Mr. Curkendall, subsequently was designated the deciding official in the case, pursuant to the agency's procedures. In due course, after hearing and consideration of Ms. Graviss' responses to the charge, he issued a formal decision removing her.

During her appeal from the agency's decision of removal, which she elected to take to an arbitrator rather than the Merit Systems Protection Board ("MSPB"), the existence of the Calvano email was disclosed. The arbitrator upheld the removal by the agency, and appeal was taken here.[1]

The issue presented is, does the existence of that email sufficiently taint the agency's removal process so as to deprive Ms. Graviss of the constitutional due process under the Fifth Amendment to which she is entitled?

## 1. *Loudermill*

The Supreme Court in 1985 set out the basic parameters of proper process for removing employees from public service, at least as far as constitutional due process requires.[2] *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985). In the combined cases generally known as *Loudermill*, the employees were summarily dismissed without a hearing. The issue before the Court was what rights, if any, does a public employee have to notice and opportunity to be heard before the decision to remove is

---

[1] It is an open question whether Ms. Graviss' union is a proper petitioner in this case; however, as that question was not raised by the Government, it need not be addressed here.

[2] It is of course possible for statutes and regulations, as well as employment contract provisions, to impose more process than what is due under the Constitution.

made (the pre-decision right), when post-decision proce-
dures are in place. The Court announced that, under the
Constitution's due process clause, "the tenured public
employee is entitled to oral or written notice of the charg-
es against him, an explanation of the employer's evidence,
and an opportunity to present his side of the story. To
require more than this prior to termination would intrude
to an unwarranted extent on the government's interest in
quickly removing an unsatisfactory employee." *Id.* at 546
(citations omitted).[3] In *Loudermill*, there was no issue of
a prior communication among those in the agency chain of
command regarding the particular matter. (We refer here
to such prior communication as *ex parte* communication,
the general term *ex parte* simply meaning without the
knowledge or involvement of all parties).[4]

### 2. *Stone*

The issue of *ex parte* communication was before this
court fourteen years later in *Stone v. Federal Deposit
Insurance Corp.*, 179 F.3d 1368 (Fed. Cir. 1999).[5] Mr.
Stone was removed from federal employment following a
full hearing and opportunity to respond to the charges.
However, subsequently, during his appeal of the agency
decision to the MSPB, Mr. Stone learned that a previously
undisclosed memo on the matter from the official recom-

---

[3]    Since *Loudermill* involved state employees, the
due process clause was that of the 14th Amendment; no
one doubts that federal employees such as Ms. Graviss
have at least the same basic rights under the due process
clause of the 5th Amendment.

[4]    *See, e.g., ex parte*, Black's Law Dictionary (10th
ed. 2014).

[5]    This court also addressed the issue in other cases
post-*Loudermill*. *See, e.g., DeSarno v. Dep't of Commerce*,
761 F.2d 657 (Fed. Cir. 1985).

mending Stone's removal had been sent to the deciding official, and that a second such memo had been sent to the deciding official by another agency official urging Mr. Stone's removal. The MSPB nevertheless affirmed the removal, and he appealed here.

The majority in the case now before us turned to *Stone* for its analysis of the applicable law. In *Stone*, this court said that "not every *ex parte* communication is a procedural defect so substantial and so likely to cause prejudice" that it constitutes a due process violation. *Id.* at 1376–77. "Only *ex parte* communications that introduce new and material information to the deciding official will violate the due process guarantee of notice. In deciding whether new and material information has been introduced by means of ex parte contacts, the Board should consider the facts and circumstances of each particular case." *Id.* at 1377. The court then laid out several factors to be considered: "whether the *ex parte* communication merely introduces 'cumulative' information or new information; whether the employee knew of the error and had a chance to respond to it; and whether the *ex parte* communication were of the type likely to result in undue pressure upon the deciding official to rule in a particular manner." *Id.*

The *Stone* court declined to express any opinion about whether the *ex parte* communications in that case constituted new and material information; indeed, the court's opinion does not elaborate on exactly what was said in either of the communications involved. The matter was returned to the MSPB for further consideration pursuant to the court's newly-articulated criteria. (On remand, the MSPB disposed of the case by a single word, "Dismissed." 84 M.S.P.R. 623 (Oct. 15, 1999)).

### a.  *The first Stone factor*

The majority here finds the email from Dr. Calvano constitutes a communication of new and material infor-

mation in violation of the first *Stone* factor.  I disagree. First, the mere fact of a prior communication, that is, some earlier communication from an official in the chain of command to the eventual deciding official regarding the existence of a personnel problem, cannot constitute by itself the proscribed *ex parte* communication.  If it did, the rule would be simply that *any* communication by a supervisory officer regarding an existing personnel issue to a lower administrative officer who then becomes the deciding official in the particular case violates due process.

This would mean that in any well-functioning administrative agency, in which lower administrative officers regularly confer with and seek the advice of their responsible superiors, especially about personnel problems, no subsequent process within the administrative chain of command regarding such matters could be conducted. Every disciplinary case would have to be referred to an outside entity for initial review and decision.[6]  That is contrary to good administrative practice, and certainly not the process that Congress and the agencies have in place.  As a general proposition, courts regularly require that employees exhaust their administrative remedies before they can seek relief in the courts.

What the first *Stone* factor addresses, when it invokes the concept of a relevant *ex parte* communication, is a communication that contains new and material information *about the facts and circumstances of the event* at

---

[6]    The Administrative Procedure Act ("APA") prohibits *ex parte* communications, but *not between agency employees* such as Dr. Calvano and Mr. Curkendall.  *See* S. Rep. No. 354, 94th Cong., 1st Sess. 36 (1975); H.R. Rep. No. 880, 94th Cong., 2d Sess. 20 (1976) ("Communication solely between agency employees are excluded from the section's prohibition.").

issue. And even then, as the *Stone* court notes, a comment on the facts may not be relevant if it is just "cumulative" information. In the case before us, Dr. Calvano's email did not contain any new information whatsoever about the specifics of the incident described in the Serious Incident Report, on which the charges against Ms. Graviss were based

It could be argued that the email did provide Mr. Curkendall new information—that is, the fact that Dr. Calvano, his superior, was concerned about this employee and wanted something done. Given the content of the email, however, it seems unlikely that this was the first inkling that Mr. Curkendall had regarding his supervisor's concerns; Dr. Calvano obviously had been advised previously that Ms. Graviss' behavior with the children was viewed as a problem by the school principal.

In any event, even if the fact of Dr. Calvano's concerns were new information, they did not prove to be material, as I shall explain in the discussion of *Stone* factor three, below. Accordingly, the circumstances of this case do not disclose a relevant *ex parte* communication containing new and material information.

b. *The second Stone factor*

Even if it could be argued that the email from Dr. Calvano constituted new and material information, the second *Stone* factor asks whether the employee knew of the communication and had a chance to respond to it. There is no argument that the existence of the Calvano email was not disclosed to the employee at the time she had her hearing before the administrative deciding official; the existence of the email came out during the appeal proceedings before the arbitrator. At that point, the arbitrator gave Ms. Graviss full opportunity to respond to the implications of that communication; it became a major issue in the record before the arbitrator.

In terms of due process, it is important that the employee be given a full and fair hearing at which an *ex parte* communication such as this is considered and evaluated.  In this case, that full and fair hearing was held before the arbitrator, the review route chosen by Ms. Graviss.  The record before the arbitrator reveals a full discussion and consideration of the email's existence and possible consequences.  Ultimately the arbitrator found that the email did not affect the propriety of the administration's removal decision.

In *Loudermill*, the Supreme Court made special note of the state's statutory mechanisms for review of administrative personnel decisions.  The existence of such review mechanisms was part of the Court's explanation for why it established a fairly basic notice and hearing requirement in order to comply with due process.  *Loudermill*, 470 U.S. at 546 (noting that the Court's decision "rests in part on the provision in Ohio law for a full post-termination hearing"); *see also id.* at 542 n.7 (noting that "[t]here are, of course, some situations in which a post-deprivation hearing will satisfy due process requirements").

In this case, the hearing before the arbitrator, though it occurred post-deprivation, provided the employee with a full opportunity before a disinterested decision-maker to explore the existence and ramifications of the now-disclosed *ex parte* communication, including opportunity to confront the key witness, the administrator who made the decision to remove her.  Undoubtedly, it would have been preferable had the issue been fully aired at the initial stages of the administrative review, for whatever relevance to the merits it may have had.  But it would not be appropriate for us in this case to impose a higher due process standard than that called for by the *Loudermill*

ruling, thus creating an indeterminate higher standard that would have the potential for chilling the communication needed among responsible administrative officers.[7]

c. *The third Stone factor*

Finally, the third *Stone* factor asks whether the *ex parte* communication was of the type likely to result in undue pressure upon the deciding official to rule in a particular manner. That question is one of fact—whether this particular communication is the type likely to result in undue pressure upon the deciding official in this case. Each case will be different—different content to the communication, different source from which the communication emanated, different recipient of the communication, and different defendant's conduct. That is why, as

---

[7]  See also the concurring position of our sister circuits. *See, e.g.*, *Senra v. Town of Smithfield*, 715 F.3d 34, 39–40 (1st Cir. 2013); *Coollick v. Hughes*, 699 F.3d 211, 220–21 (2d Cir. 2012); *McDaniels v. Flick*, 59 F.3d 446, 456-460 (3d Cir. 1995); *Dennison v. County of Frederick, Va.*, 921 F.2d 50, 55 (4th Cir. 1990); *Caine v. Hardy*, 943 F.2d 1406, 1412 (5th Cir. 1991); *Kuhn v. Washtenaw County*, 709 F.3d 612, 621–23 (6th Cir. 2013); S*chacht v. Wisconsin Dep't of Corrections,* 175 F.3d 497, 503 (7th Cir. 1999), *receded from on other grounds in Higgins v. Miss.*, 217 F.3d 951 (7th Cir. 2000); *Krentz v. Robertson Fire Prot. Dist.*, 228 F.3d 897, 902 (8th Cir. 2000); *Association for L.A. Deputy Sheriffs v. County of L.A.*, 648 F.3d 986, 991–92 (9th Cir. 2011); *Saavedra v. City of Albuquerque*, 73 F.3d 1525, 1533 (10th Cir. 1996); *McKinney v. Pate*, 20 F.3d 1550, 1556–57 (11th Cir. 1994); *Wash. Teachers' Union Local No. 6, Am. Fed'n of Teachers, AFL-CIO v. Bd. of Educ. of the Dist. of Columbia*, 109 F.3d 774, 781 (D.C. Cir. 1997).

the *Stone* court put it, the outcome turns on "the facts and circumstances of each particular case."  179 F.3d at 1377.

In this case, the arbitrator heard the witnesses, including the agency's deciding official.  The question of whether Mr. Curkendall, the deciding official, was pressured at all, much less unduly pressured, was explored at length.  He denied feeling any pressure to decide the case one way or the other, explaining that he understood and felt free to make the decision regarding removal based on the facts before him.  The arbitrator, after hearing the testimony of the witnesses, concluded that the deciding official acted according to his best judgment on the facts before him, and without regard to the earlier *ex parte* communication.

That factual conclusion is reviewed by us under the deferential standard prescribed by statute—is there substantial evidence in the record supporting it?  While there are many cases that delve into the meaning of "substantial evidence," sometimes with different terminology, they all come down to this—it is not whether a reviewing judge would have so concluded, rather it is whether the evidence is such that a reasonable person could have arrived at this conclusion.[8]  An even more deferential standard applies to the fact-finder's determinations about the credibility of the witnesses.[9]

In this case, the facts in the record establish that a senior administrator was concerned about a new incident involving this teacher, to the point of expressing that concern, and before any formal charges were brought.

---

[8]    *See, e.g.*, *Parker v. United States Postal Serv.*, 819 F.2d 1113, 1115 (Fed. Cir. 1987).

[9]    *See, e.g.*, *Hambsch v. Dep't of the Treasury*, 796 F.2d 430, 436 (Fed. Cir. 1986).

The actual charges brought did not reflect the concerned administrator's particular views of what charges could be brought. The deciding official testified that he had not been directed by the particular views of his superior in the case, and provided examples of occasions when he disagreed with such suggestions in the past.

The deciding official convinced the arbitrator that he did not feel any pressure regarding how to decide the case, one way or the other. This conclusion must be understood in the context of administrative agency processes. In *Loudermill*, the Court commented that "the pretermination hearing need not definitively resolve the propriety of the discharge. It should be an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Loudermill*, 470 U.S. at 545–46.

This recognizes that, by virtue of their position as part of the agency, administrative officers when hearing a case such as this are not expected to be in the same position of impartiality as a judge or other independent decision-maker. *Compare Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980) ("The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases."), *with Walker v. City of Berkeley*, 951 F.2d 182, 183–84 (9th Cir. 1991) (holding that pre-deprivation due process under *Loudermill* does not require "an impartial decisionmaker at the pretermination stage . . . so long as the decisionmaker at the post-termination hearing is impartial").

An understanding of the administrative context reflected in the record before us, coupled with the arbitrator's personal assessment of the veracity of the witnesses, makes the arbitrator's factual conclusions unassailable under our standard of review. The majority's effort to transpose this factual conclusion into something else,

something subject to the unlimited discretion of reviewing judges, is, in my view, inconsistent with controlling law.

### 3.

As the *Stone* court stated, "[u]ltimately, the inquiry . . . is whether the *ex parte* communication is so substantial and so likely to cause prejudice that no employee can fairly be required to be subjected to a deprivation of property under such circumstances." 179 F.3d at 1377. That is far from this case.

For all these reasons, the arbitrator's decision should be affirmed. I respectfully dissent from the contrary decision reached by my colleagues in the majority.